1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF HAWAII

3

UNITED STATES OF AMERICA,     ) CRIMINAL NOS.
4                             ) 17-00582JMS-WRP
        Plaintiff,            ) 18-00068JMS-WRP
5                             )
     vs.                      )
6                             ) Honolulu, Hawaii
LOUIS M. KEALOHA (2),         ) November 30, 2020
7                             )
        Defendants.           )
8                             ) SENTENCING AS TO COUNTS 1,
                              ) 2, 6, AND 8 OF THE FIRST
9                             ) SUPERSEDING INDICTMENT
                              ) UNDER CR17-00582, AND COUNT
10                            ) 4 OF THE THIRD SUPERSEDING
                              ) INDICTMENT UNDER CR18-00068
11   _____ )

12              TRANSCRIPT OF PROCEEDINGS
13     BEFORE THE HONORABLE J. MICHAEL SEABRIGHT
          CHIEF UNITED STATES DISTRICT JUDGE
14
APPEARANCES:
15
    For the Government:      MICHAEL G. WHEAT, ESQ.
16                           JOSEPH J.M. ORABONA, ESQ.
                             Special Attorneys to the
17                            Attorney General
                             United States Attorney's Office
18                           880 Front Street, Room 6293
                             San Diego, California  92101
19

20
    For Defendant            RUSTAM A. BARBEE, ESQ.
21   Louis M. Kealoha:       Attorney at Law
                             1188 Bishop Street, Suite 2606
22                           Honolulu, Hawaii  96813

23

24

25

1

2

3    Official Court                Cynthia Fazio, RMR, CRR, CRC
     Reporter:                     United States District Court
4                                  300 Ala Moana Blvd., C-270
                                   Honolulu, Hawaii  96850
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).

1    MONDAY, NOVEMBER 30, 2020                         1:30 P.M.

2            THE COURTROOM MANAGER:  Criminal Number

3    17-00582JMS-WRP-2, Criminal Number 18-00068JMS-WRP-2, United

4    States of America versus Louis M. Kealoha.

5            These cases have been called for sentencing as to

6    Counts 1, 2, 6 and 8 of the first superseding indictment in

7    Criminal 17-582, and Count 4 of the third superseding

8    indictment under Criminal 18-68.

9            Counsel, please make your appearance for the record.

10            MR. ORABONA:  Good afternoon, Your Honor.  Joseph

11    Orabona and Michael Wheat on behalf of the United States.

12            THE COURT:  Yes, good afternoon.

13            MR. BARBEE:  Good afternoon, Your Honor.  Rustam

14    Barbee appearing with Louis M. Kealoha, who, of course, is

15    present here at the defense table.

16            THE COURT:  All right.  Yes, good -- good afternoon to

17    both of you.  You may be seated.  Thank you.

18            All right.  So we have a number of things to cover

19    this afternoon.

20            So Mr. Kealoha was found guilty by a jury in 17-582,

21    Counts 1, 2, 6 and 8.  And then he pled to Count 4 of the third

22    superseding indictment in 18-68.  And of course, there was a

23    plea agreement in relation to that count.

24            So, Mr. Barbee, let me start with you and ask if you

25    and Mr. Kealoha have had sufficient time to read, review and

1    discuss the presentence report and to file any objections,

2    whether factual or legal, in writing.

3              MR. BARBEE:  Yes, Your Honor, we have.

4              THE COURT:  All right.  Is that right, sir?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  All right.  Thank you.

7              All right.  So, first of all, I do accept the plea

8    agreement in the case.  I find that it does adequately reflect

9    the seriousness of the actual offense behavior, and accepting

10   it will not undermine the statutory purposes of sentencing.

11             So what I thought I would do is -- is go through what

12   I understand the remaining objections to be and make sure I

13   have that right, and see -- make sure counsel agrees with me.

14             Starting with the government, there's an objection to

15   the minus two for role in the offense relating to the bank

16   fraud calculation.  And I believe that's all on the

17   government's side that remains.  Is that accurate?

18             MR. ORABONA:  That's correct, Your Honor.

19             THE COURT:  Okay.  And then, Mr. Barbee, for you, you

20   submit that Mr. Kealoha should not receive a three-level upward

21   adjustment for role in the offense, and you object to the

22   offense level of 24 in the bank fraud case under

23   2B1.1(b)(17)(A).  And that's what I have as your remaining

24   objection.  Is that accurate?

25             MR. BARBEE:  The only one which is collateral to the

1    last one you mentioned is the two-level grouping increase.

2              THE COURT:  That follows from that, though, right?

3              MR. BARBEE:  That -- that's right.

4              THE COURT:  I mean, if I agree with you on that, then

5    we have to look at that.

6              MR. BARBEE:  That's right.

7              THE COURT:  Okay.  Okay.

8              All right.  So let's start with the government's then.

9    You want to -- Mr. Orabona, are you going to be arguing?

10             MR. ORABONA:  Yes, Your Honor.  We would submit on our

11   papers, unless the Court has any questions with respect to our

12   position on the minor role.

13             THE COURT:  All right.  Well, I'm going to start with

14   the minus two for the role on this, Mr. Barbee.  Do you have

15   anything you want to add to that?

16             MR. BARBEE:  Depends on which way the Court is going

17   to rule, but if I need to make a record, I would like to make a

18   record.

19             THE COURT:  All right.

20             MR. BARBEE:  Okay.  Your Honor, with regard to the

21   two-level assess -- or given by the Probation Department, Your

22   Honor, there's a significant difference between the Kealoha

23   defendants in this case obviously.  And they should be viewed

24   differently and punished differently.

25             Mr. Kealoha had no knowledge or participation in much

 1   of his spouse's activities that she conducted.  For example, he

 2   had no knowledge or participation in her thefts committed while

 3   acting as an attorney and a fiduciary for Ransen and Ariana

 4   Taito, nor did he participate in requesting that Ransen Taito

 5   lie to the grand jury.  That was all her.

 6          He did not assist in arranging for friendly counsel

 7   for Mr. Taito.  He had no participation in her creation and

 8   forgery of a false HPD document that was purportedly taken and

 9   signed by the Honolulu police officer to support her claim of

10   identity theft.

11          He had no knowledge or participation in her creation

12   and use of a fictitious notary, Alison Lee Wong.  He had no

13   participation in her opposing Gerard Puana's DANC plea that had

14   already been granted earlier.  And of course, Judge, he had no

15   participation in her asking Jesse Ebersole to lie to the grand

16   jury, and he certainly had no knowledge of her six-year long

17   secret relationship and the gifts given to Mr. Ebersole.

18          Therefore, we submit that there is a significant

19   difference justifying a two-level minor role adjustment as

20   reflected in Paragraph 143 of the presentence report.

21          THE COURT:  All right.  Thank you.

22          All right.  So to be clear, just so everyone knows,

23   we're talking about the bank fraud calculation now, because

24   we -- we calculate these separately.  And that's what you --

25   that's what you're talking about, Mr. Barbee.  I just want to

1    make it clear for everybody else here --

2            MR. BARBEE:  Yes, Your Honor.

3            THE COURT:  -- that's what we're talking about.

4            So the government objects to this minus two for role

5    in the offense.  I am going to uphold the Probation's view on

6    this.

7            Section 3B1.2(b) of the guidelines provides for a

8    two-level reduction if a defendant was a minor participant in

9    any criminal activity.  The defendant bears the burden of

10   proving entitlement by preponderance of the evidence.  And a

11   "participant" is defined as a person criminally responsible for

12   the commission of the offense, although the person need not

13   have been convicted.  An average participant is viewed in

14   relation to the defendant's own scheme, not some hypothetical

15   offender, for instance.

16           And here, it's clear there are two participants in the

17   bank fraud offense, the two Kealohas.

18           Now, I'm not going to go into great detail as to

19   Amendment 794, effective November 1, 2015, and what it says,

20   but for the record, I've -- I've reviewed all of that and am

21   aware of it.

22           So for the reasons stated in the report on Pages 63

23   and 64, I agree that the two-level downward adjustment applies.

24   Although I do recognize the government has points here, and

25   this is a bit of a close call, but I do believe by a

1    preponderance of the evidence, the defense has shown it does

2    apply, the two-level reduction.

3           In short, I agree under the totality of the

4    circumstances that Louis K. Kealoha is substantially less

5    culpable than Katherine as it relates to the bank fraud.

6           Now, Katherine is the only other participant, so I

7    must compare his role with hers.  And I also agree that

8    although Louis likely understood the general scope of the

9    illegal conduct as argued by the government, Katherine ran the

10   show.  I think that's pretty clear.  As Mr. Barbee points out,

11   it was Katherine, for example, who knew about the Taito trust

12   accounts and was able to pledge those assets illegally as part

13   of the loan applications.  So I'm going to uphold that

14   two-level reduction.

15          Now, as far as the mailbox case, Mr. Barbee, you argue

16   that Mr. Kealoha should not receive a three-level upward

17   adjustment for a role in the offense, and I think the

18   government probably is only going to argue for a plus two based

19   on the plea agreement.

20          MR. ORABONA:  That's correct, Your Honor.

21          THE COURT:  All right.  Mr. Barbee, then I'll turn to

22   you on that, if you wish to argue anything beyond your

23   briefing.

24          MR. BARBEE:  No, Your Honor.  We'll submit on our

25   papers.

1          THE COURT:  All right.  Anything from the government?

2          MR. ORABONA:  Same, Your Honor, we submit.

3          THE COURT:  All right.  So the report includes a

4    three-level upward adjustment for role in the offense for an

5    aggravating role in the mailbox case.  So now we're not in the

6    bank fraud part but in the mailbox case.

7          The government carries the burden by preponderance of

8    the evidence to prove an upward adjustment for the role -- for

9    a role in the offense applies.  For a three-level increase, the

10   defendant must be a manager or supervisor but not an organizer

11   or leader, and the criminal activity must involve five or more

12   participants or was otherwise extensive.  A "participant" is

13   defined again as a person criminally responsible but need not

14   be convicted.  To qualify, a defendant must have been the

15   manager or supervisor of one or more other participants.

16         And so the government must demonstrate that the

17   defendant oversaw one or more other participants, meaning

18   persons who are criminally responsible for the commission of

19   the offense.  But again, need not have been convicted.

20         In making this determination, a district court should

21   consider the exercise of decision-making authority, the nature

22   of participation in the commission of the offense, the

23   recruitment of accomplices, the claimed right to a larger share

24   of the fruits of the crime, the degree of participation in

25   planning or organizing the offense, the nature and scope of the

1    illegal activity, and the degree of control and authority

2    exercised over others.

3          And that comes out of comment 4.

4          Now, first, there's an assertion that there were not

5    five participants.  Now, we obviously have Louis Kealoha,

6    Katherine Kealoha, Derek Hahn and Bobby Nguyen.  We have the

7    four convicted.  And although I agree there may be a question

8    as to whether Sellers was a participant given his plea and the

9    specific testimony, I conclude rather easily that Niall Silva

10   was a participant.

11         Mr. Silva testified at trial that Derek Hahn had

12   called him on June 22nd, 2013, at 2:30 p.m., and asked him to

13   come to the office.  Lieutenant Hahn then gave him the hard

14   drive for processing, and told him that it wouldn't look good

15   if the truth was known that Bobby Nguyen had obtained the hard

16   drive.  So Mr. Silva did as asked.  And then clearly obstructed

17   justice.

18         He filled out that false HPD report that we saw at

19   trial so many times, stating that he had retrieved the hard

20   drive at the residence at 8:59 a.m.  And then he, of course,

21   was the first witness at the Gerard Puana mailbox trial and

22   under oath told the same lie.  And then after his testimony, he

23   let Bobby Nguyen know that he had lied so that Bobby would not,

24   quote, throw me under the bus.

25         Now, let me say the obvious.  Louis Kealoha was the

1   chief of the Honolulu Police Department, and those in the CIU
2   were largely handpicked or at least approved by him and worked
3   under him.  And I can draw reasonable inferences from the
4   evidence adduced at trial that Derek Hahn and Bobby Nguyen were
5   part of the overall scheme to frame Gerard Puana at the behest
6   of their supervisor, Louis Kealoha.
7           For example, the only fair inference that I can draw
8   from the fact that CIU was involved in this massive 24-hour
9   surveillance on Gerard Puana in June 2013 is that it was
10  approved by Louis Kealoha.
11          Now, to be clear, I am not finding that the adjustment
12  applies simply because Louis was chief and others were
13  subordinate to him.  That is not enough by itself.  But I am
14  making the finding based on the totality of the evidence before
15  me, which includes reasonable inferences, that Louis acted in
16  his role as chief to take specific actions by his subordinates.
17  That is, he was a manager and supervisor to Hahn, Nguyen and
18  Silva, and there were five or more participants.  And he
19  otherwise qualifies for the three-level adjustment because he
20  was a manager or supervisor of one or more.  So I'm going to
21  uphold that finding.
22          All right.  Mr. Barbee, the 24-hour -- sorry,
23  24-hour -- 24-level increase under the bank fraud guideline.
24          MR. BARBEE:  Yes, Your Honor.  Thank you.
25          First of all, I would note that in the government's

1    memorandum that they agreed that, on Page 11, there was no

2    intended loss and there was no loss.  Also in the memorandum of

3    plea agreement and the sentencing agreement, parties agreed

4    that the two-level enhancement would apply as opposed to the 24

5    level in that section.

6         So the section we're talking about is 2B1.1, of

7    course.  And 2B1.1(b)(17)(D) was applied instead of the

8    two-level increase that is specifically discussed in the

9    sentencing agreement and in the memorandum of plea agreement.

10        So my point is this, Judge:  That that was negotiated

11   in good faith between the parties, and there is good policy

12   reasons for this Court, and I don't presume to tell the Court

13   what to do, but there are good reasons that do exist for

14   supporting agreements such as this between the parties.  The

15   goal in reaching agreement before -- of these types before

16   appearing before the Court is to resolve disputed matters and

17   avoid the needless consumption of time, resources in

18   litigation.

19        So in cases like this where the parties have agreed

20   that a two-level enhancement would potentially apply, but have

21   not agreed as the Probation Department has found, that a

22   24-level or an enhancement to a level 24 applies, especially in

23   this case given that it's agreed that there was no intended

24   loss, and there was no actual loss.  And I would submit that

25   zero dollar loss should be punished less severely than cases

1    where a theft, larceny or embezzlement, which is the title of

2    the -- of the guideline provision, where the victim actually

3    suffers an actual loss of over $1 million.  And here again, it

4    was zero.

5           So the punishment fundamentally, it seems to me,

6    should be less for Mr. Kealoha's situation as opposed to the

7    latter situation where funds were actually intended to cause a

8    loss and did cause a loss.

9           THE COURT:  All right.  Thank you, Mr. Barbee.

10          MR. ORABONA:  Your Honor, we stand by the plea

11   agreement as well.  We recommended a two-level increase for

12   this because there was no loss.  The banks didn't suffer a loss

13   in this particular case.

14          THE COURT:  All right.  All right.  Well, see, this is

15   the problem I have with these plea agreements where you do

16   that, because, wow, you missed it, didn't you?  Don't say a

17   word.  Because I don't want you to breach the plea agreement.

18   But you missed it.

19          As recommended by Probation under the bank fraud

20   guidelines, an offense level 24 applies in this case because

21   the defendant derived more than $1 million in gross receipts

22   from one or more financial institutions as a result of the

23   offense.  This is under 2B1.1(b)(17)(A) and (D).

24          It states, quote:  If the defendant derived more than

25   $1 million in gross receipts from one or more financial

1    institutions as a result of the offense, and if the resulting

2    offense level is less than 24, increase to 24.

3         The problem is it's plain English.  There's no --

4    you're arguing 3553(a) now, Mr. Barbee, not guidelines is the

5    problem I'm having.  I've got to apply the guidelines.  And

6    it's pretty clear the way this guideline is written.  There are

7    no exceptions.  And it talks about gross receipts.

8         Gross receipts equal the amount -- the entire amount

9    of the loan proceeds.  Although there's not a lot of law in

10   this guideline provision, United States versus Gharbi, 510 F.3d

11   550 -- excuse me -- a Fifth Circuit case from 2007 so held.

12        So Louis and Katherine received a total of

13   $3.7 million from financial institutions as a result -- as a

14   result of the bank fraud.  Now, I understand this is not a loss

15   amount.  Money was paid off.  It represents the funds, the

16   gross funds received based on the fraud.  But the fact that

17   there's no pecuniary loss is not relevant to this specific

18   guideline provision.

19        And the fact that the parties stipulated to a

20   different conclusion simply doesn't bind me.  I think I made

21   that as clear as I could when I took the pleas.  This is not in

22   my view a close call.  The provision applies, and there is an

23   increase to 24 as a result.

24        All right.  So I understand there are no further

25   objections to either factual findings or conclusions as to

1    guidelines; is that right?

2              MR. ORABONA:  That's correct, Your Honor.

3              MR. BARBEE:  Correct.

4              THE COURT:  All right.  So I will adopt the factual

5    findings in the report and conclusions as to the guidelines as

6    well.

7              All right.  So, Mr. Barbee, I think I'll start with

8    you then.  Well, let me -- let me go through what we have here.

9              On the mailbox case, we have a total offense level 24,

10   the bank fraud case a 22, and then we have plus two on the unit

11   calculation to get from a 24 to a 26, minus two for acceptance

12   gets us to a 24.  And a 24 criminal history, category 1 is 51

13   to 63 months, supervised release of two to five years, fine

14   range of 20,000 to 200,000, restitution of a total of

15   $237,698.56 based on the plea agreement.  Is that right?

16             MR. ORABONA:  That's correct, Your Honor.

17             THE COURT:  All right.  And we'll get -- we'll get to

18   some of the questions I have about that a little bit later.

19   And a $500 special assessment.

20             Do both counsel concur with that?

21             MR. ORABONA:  Yes, Your Honor.

22             MR. BARBEE:  Yes, Your Honor.

23             THE COURT:  All right.

24             All right.  So, Mr. Barbee, with that then I will turn

25   to you.

1          MR. BARBEE:  Yes, Your Honor.  In addressing the

2     appropriate sentence to be meted out here today to Mr. Kealoha,

3     I would just point to the factors set forth at 18 U.S.C. 3553.

4     The sentencing law does require that the Court impose a

5     sentence not greater than necessary to effectuate the goals of

6     sentencing and the policies of sentencing.  One of the factors

7     that is mentioned very early in the statute, not the paramount

8     thing, but one of the paramount factors is the history and

9     characteristics of the person to be sentenced.

10          The Probation Department reports details of the

11     history of Mr. Kealoha.  He was born and raised on the island

12     of Oahu under humble circumstances.  He has no previous charges

13     or convictions of anything.  He's 60 years old.  Prior to

14     involvement and commission of this offense, he had a successful

15     30-plus-year career serving the community in law enforcement,

16     beginning at the rank of rookie police officer and ending, of

17     course, as the chief -- the tenth Chief of Police for the City

18     and County of Honolulu.

19          While working full time, he attended college.  He got

20     his associate's, his bachelor's, his master's and his

21     doctorate, all by working full time.  He married his

22     then-sweetheart and raised a child together.  His mother

23     Beatrice, age 86, wrote a very brief letter to the Court, which

24     I did not receive in time to get to the Court earlier.

25          THE COURT:  I did get it, though.

1          MR. BARBEE:  I've given a copy to the prosecution,

2     Your Honor.  I'd like to read just a couple excerpts from it.

3          "Your Honor, my name is Beatrice L. Kealoha.  I'm

4     86 years old and the mother of Louis M. Kealoha.  My husband

5     Louis K. Kealoha and I were married for 43 years before his

6     passing in 2001."

7          Skipping ahead:  "I later worked at Pearl Harbor as a

8     computer operator from 3 to 11 p.m. so that I could continue

9     being a stay-at-home mom.  We later opened a local Hawaiian

10    food restaurant in which my husband and sons all helped in the

11    operation.

12         "One day while at City Hall, there's an advertisement

13    recruiting people for the Honolulu Police Department.  From our

14    many talks, I knew that Louis wanted to serve the community.

15    He took the application with him knowing that this may be his

16    calling.  Louis became a police officer at 22 years old and was

17    selected to enter the recruit class in 1983.  Having the heart

18    and desire to make law enforcement his career, he attended

19    night school and earned several college degrees.

20         "When Louis got married, he told my husband and me, I

21    want to be married once and raise my family the same way he was

22    raised.  Father devoted to work and mother took care of

23    finances.  Louis has always worked diligently throughout his

24    life and was content in the simple things in life.  Never a

25    lavish lifestyle, like is reported in the media.  He never

1   checked on his finances and always felt that he was living

2   within his means and believed what he was told by his wife.

3   His only weakness was truly -- being truly dedicated to his

4   marriage vows and utmost trust in his wife.

5           "In closing, I humbly ask for the Court's mercy on his

6   sentence."

7           And then, Judge, I'd like to point out the presence in

8   the courtroom of friends and family.  Mom Beatrice is here;

9   brother, Andre Peters; sister-in-law, Rose Peters; long-time

10  friends, Karen Mondoy and Kurt Kakuna -- Kekuna are all here in

11  support.

12          So Mr. Kealoha does have friends and family support,

13  unlike a lot of defendants that appear before this Court

14  regularly, all alone with just their lawyer.

15          I'd like to read excerpts, if I could, Judge, from

16  some of the letters that were submitted to the Court.  And

17  starting with Andrew Lum, retired HPD major.

18          Excerpts include:  "Recently with all the media

19  coverage of the allegations prior to conviction, there was a

20  lot of information revealed that was deeply disturbing and

21  difficult to accept knowing the character of Louis.  The

22  information regarding the extramarital affair of his wife was

23  one that was especially surprising to me, and I'm sure hurtful

24  to Louis.  I realize I didn't know his wife Kat as well as I

25  thought, and this information was shocking to me because --

 1   well, Louis was very committed to his marriage and family.

 2         "I reserve judgment on Kat on her allegations.  I hope

 3   that you would give Louis a separate consideration in

 4   determining -- determining his punishment.  His role in all of

 5   this I believe was on a different level.  I'm not absolving him

 6   of blame.  I'm sure there were ways he could have made himself

 7   more aware of things and taken more proactive steps in

 8   resolving some of these serious issues his wife had involved

 9   him in."

10         From Karen Mondoy, just briefly, Judge:  "Like other

11   spouses, he loved his wife so much and placed his total and

12   complete trust in her to handle the daily affairs, financial

13   decisions and family matters.  I'm sure there are other spouses

14   who are in very similar situations and predicaments, however

15   ignorant it may be."

16         And I think a part of that last statement, Your Honor,

17   comports with the evidence at trial where it was testified to

18   that during a forensic evaluation of the many, many, many bank

19   accounts between the Kealohas, there were several that were

20   Katherine Kealoha only.  I think at least two that were joint.

21   And an examination of the past history that Mr. Kealoha wrote

22   few, if any, checks from that account.  The numbers ten and

23   five were mentioned.  It wasn't confirmed, but it was extremely

24   few over those many, many years.

25         Next from -- I believe this is David Scheidt, good

1    friend, one surfing buddy.  "I consider myself one of Louis'

2    trusted friends and confidant.  I can say with confidence based

3    on my relationship with Louis, though he was the Chief of

4    Police in public, in private his wife Katherine ruled the

5    house, finances, and day-to-day decisions regarding their

6    relationship and marriage.  We were talking in the ocean, I

7    could see the embarrassment on his face once the fireman was

8    indicted on lying to federal officers.  I believe he truly had

9    no idea.  Louis was saying during trial that he realized he

10   didn't know the person he married."

11        Next from Christopher Case-Grillo:  "I am absolutely

12   confident that Louis possesses deep and genuine contrition for

13   his circumstances for which he is being held accountable.  He's

14   a man who will take ownership of many decisions.  He is not a

15   self-pitying, denying and bitter character.  This is simply not

16   his true nature.  In many ways, Louis is philosophical and

17   keenly aware of the need for him to take responsibility,

18   recognize the lessons to be learned, and move forward with

19   personal integrity in a productive fashion for the remainder of

20   his life.  I believe he will use his extensive education,

21   experience and hard-earned wisdom to redeem himself and be an

22   asset to others.  It is my hope that justice is meted out, so

23   will be mercy."

24        And I was going to talk about some mitigating factors

25   to emphasize to the Court, but -- I know it might be unusual,

1   but I would like him to allocute before I do these.

2          THE COURT:  All right.  You may, yes.  Yes, that's

3   fine.

4          So let me just explain to you what your rights are,

5   just so it's on the record, Mr. Kealoha.  You have a right to

6   speak to me, sir.  This is your opportunity to do so.

7   Mr. Barbee would like to sort of do that before he finishes up,

8   which I'm fine with.  But I just want you to know you don't

9   have to, and if you don't speak, I won't hold it against you.

10  If you do speak, the only thing I ask is you pull that

11  microphone up a little bit and speak into it.  With masks and

12  face shields and everything, it's a bit of a challenge.  All

13  right?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  All right.

16         THE DEFENDANT:  Dear Judge Seabright, I am deeply

17  sorry and ashamed for the negative impact my actions had on

18  Florence and Gerard Puana, the community, the Honolulu Police

19  Department, and my family and friends.  Gerard used to be my

20  friend, and I betrayed him falsely believing he was a threat to

21  my family.

22         I was born and raised in Honolulu.  While growing up

23  it was always my goal to be the best person I could be and to

24  serve my community.  As a result, I was privileged to serve in

25  the Honolulu Police Department as a police officer for

1  33 years.  I have strong family values.  I did my best to be a

2  good son, brother and father.

3        I also got married later in life so I could adequately

4  provide for my wife and daughter.  Although my life was busy

5  and chaotic, I always made sure to spend quality time with my

6  family.  In addition, I actively contributed time and resources

7  to my community through various charities and educational

8  institutions.  In my spare time, I put myself through college,

9  conducted classes to help police officers to study for

10  promotional examination, and was a college lecturer to prepare

11  the next generation of law enforcement professionals.

12        In my life I have failed more than I succeeded.  But I

13  never gave up.  In this situation I failed to live up to the

14  standards I set for myself and as a police chief.  In an

15  orderly society, trust in public officials is paramount.  I

16  betrayed that trust and am truly sorry.

17        The damage I have caused is left to others such as

18  police, government officials and the like, who had no

19  involvement in this situation, to work to repair this damage.

20        I know my decisions have disappointed a lot of people

21  and know it will haunt me for many years to come.  This is the

22  last place in my life I thought I would be, and I vow never to

23  be here again.

24        I am deeply sorry, embarrassed, and regretful for my

25  actions, and am accepting of punishment.  I will not let this

1    mistake identify me and use it as a life lesson.  In the future

2    I plan to use this experience as an opportunity to share what I

3    have learned with others so they can avoid being in this

4    situation.

5           In closing, I am sorry for the hurt, pain and

6    disappointment I caused, and I take full responsibility for my

7    actions.  Thank you, Your Honor.

8           THE COURT:  All right.  Thank you.

9           Mr. Barbee?

10          MR. BARBEE:  Yes, Your Honor.  I have a few mitigating

11   factors I'd like to address which have been identified in

12   supporting imposing a sentence at the low end of the guidelines

13   hopefully.

14          As the presentence report notes, Mr. Kealoha was

15   not -- and the Court's noted this, too -- he was not the

16   mastermind behind these offenses.  Katherine Puana did much of

17   her misconduct and misdeeds and crimes unknown to him.

18          He has no criminal history.  Strong family support,

19   which I've mentioned.  His elderly mother, his brother and his

20   young daughter he'll be leaving when he goes to serve his term

21   of incarceration.

22          He presents a very low risk of recidivism at his age

23   of 60 years.  There are studies which I could cite, but won't

24   unless asked to, of measuring recidivism showing that people at

25   age 60 have a markedly lower rate of recidivism than those

1    younger than that age.

2            He has no substance abuse issues.  He has no need for

3    treatment or rehabilitative services in that respect.  He's

4    likely to bear the lion's share of restitution in this case,

5    without doubt, even though he's arguably lower in terms of

6    culpability.  He's shown exemplary conduct while on supervised

7    release for 37 months, beginning October of 2017.

8            And lastly, Judge, two additional factors militate in

9    favor of the sentence at the low end of the guideline range

10   here.  And those would be considering the kinds and types of

11   sentences available under 3350 -- 3355 -- 3553.  Excuse me.

12           As a former law enforcement officer, Mr. Kealoha will

13   likely suffer increased threats and danger while living inside

14   a prison facility.  And he's accepting of that.  As a result,

15   he may have to spend periods of time isolated away from other

16   inmates and potential threats which they may pose, which other

17   defendants appearing before this Court -- most other defendants

18   appearing before this Court do not face.

19           As I mentioned, at age 60, he's more -- he's less

20   likely to re-offend, but he's more vulnerable to contracting

21   and suffering serious effects of COVID-19.  The virus, of

22   course, has spread quickly among the community, and especially

23   among close confinement situations in prison populations, which

24   is evidenced by the rampant cases in the state and federal

25   facilities.

1          As recently as the last week or two or three, even

2    attorney/inmate calls have been canceled at FDC Honolulu, and

3    FDC Honolulu is not the worst affected of many of the BOP

4    facilities.  But it is a recognition of the times we live in

5    and the threats posed to those in a prison population.

6          Studies have shown that infection of COVID at prisons

7    is four times the national rate.  So that's unique in this time

8    of late 2020 as opposed to it would have been this time last

9    year or the year before or hopefully a year or two from that.

10   So he will be serving time in a harsher -- harsher conditions

11   during his sentence of incarceration.

12         And we would close by arguing that sentencing

13   Mr. Kealoha to the low end of the guideline range which the

14   Court has found will advance the parsimony clause of the

15   statutes, it will recognize the history and characteristics of

16   his pre-criminal conduct, takes into account the mitigating

17   factors identified by the Probation Department and the defense.

18   And for those reasons, Your Honor, we'd ask that the Court

19   impose the low end sentence.

20         THE COURT:  All right.  Thank you, Mr. Barbee.

21         Mr. Orabona?

22         MR. ORABONA:  Your Honor, I think we have two people

23   that would like to address the Court.

24         THE COURT:  All right.  You want to call them one at a

25   time then?

1          MR. ORABONA:  Yes, Your Honor.  I call Gerard Puana.

2          THE COURT:  Okay.

3          MR. SEITZ:  Good afternoon, Judge.  Eric Seitz

4    appearing for Mr. Puana, who is for reasons of health unable to

5    give his statement to the Court.  With the Court's permission,

6    I'll read his statement.

7          THE COURT:  All right.  Mr. Barbee, any objection to

8    that?

9          MR. BARBEE:  No objection.

10          THE COURT:  All right.

11          MR. SEITZ:  "Thank you, Your Honor, for this

12    opportunity to address the Court.

13          "Louis, I thought we were friends.  I trusted you and

14    felt safe in your company.  I still wonder how someone who took

15    a solemn oath to protect and serve the community could betray

16    so completely and coldheartedly not only an innocent man but a

17    member of your own family.  Only God knows what you're capable

18    of doing to a stranger.

19          "You had me followed, stalked and spied upon for

20    weeks.  Police officers sat outside my home at night holding me

21    hostage, terrorizing me.  These were police officers I once

22    respected, who I believed would protect me, and you turned them

23    into your personal secret police.

24          "I was stunned and in disbelief after you set me up

25    and had me falsely arrested for stealing your mailbox.  It was

1    bad enough that you helped plan such an underhanded scheme, but

2    to have me handcuffed and forced to the ground in front of my

3    girlfriend and my fellow church parishioners was nothing short

4    of evil.  To further disgrace me, when the federal trial came

5    around, you intentionally perjured yourself and testified to

6    lies about me.  And if it matters at all to you, you also put

7    my mother and family through a horrific hell.

8          "I was once a happy guy who enjoyed my life, my son,

9    my family, and friends.  My life is now completely changed as a

10   result of the crimes you committed against me.  I'm still under

11   medical care for help with symptoms of the trauma.  I have

12   problems with stress, bouts of insomnia, and continued panic

13   attacks.

14         "To this day I flinch when I see a police car or

15   notice a car or truck following too close behind me.  Thanks to

16   you, I can no longer have faith in the state justice system, in

17   the police department.

18         "There are numerous other issues I could tell you

19   about had I more time.  You, Louis, will some day be released

20   to start your life over, but the pain, sorrow and tremendous

21   damage you've caused me and my family can never ever be

22   undone."

23         Thank you, Judge.

24         THE COURT:  All right.  Thank you.

25         MR. ORABONA:  Thank you, Your Honor.

1          Charlotte Malott would like to speak on behalf of
2   Florence Puana.
3          CHARLOTTE MALOTT:  Good afternoon, Your Honor.  And
4   just a moment, got to put my glasses on.
5          THE COURT:  Sure.
6          CHARLOTTE MALOTT:  Thank you for giving me this
7   opportunity to speak and address the Court today.  This is a
8   family statement.
9          "Louis, when you married Katherine Puana, our *ohana*
10  welcomed you into the family.  Our parents John and Florence
11  Puana loved you.  They were so proud of you.  They accepted you
12  and loved you, as they did all of their grandsons.  We trusted
13  and respected you, and we felt so special to have you as part
14  of our family and showed you the hospitality.  But in return,
15  you betrayed us.
16         "When it became clear that the reverse mortgage on our
17  family home was a part of Katherine's horrid scheme, our mother
18  reached out to you in desperation because she felt she had a
19  relationship with you.  You received a copy of her
20  September 2012 letter, which was also sent to Katherine.  She
21  desperately hoped you would do the right thing and meet with
22  her.  She just wanted to talk with you and Katherine.  She
23  wanted to talk to see if you could work it out.
24         "You not only chose to ignore her letter, but you
25  personally profited from the theft.  You also helped and as

1    Katherine with her to plot to seek revenge against our family.

2    Florence and Gerard filed a civil lawsuit hoping to recoup some

3    of our losses.  That's when the harassment and badgering of

4    Katherine's grandmother began, ultimately when the sheer

5    terrorism of my brother Gerry occurred.

6            "Gerry under your direction was followed, stalked and

7    spied upon for weeks.  Police officers also sat outside his

8    home at night menacing him.  Under your authority of office,

9    you used officers who were supposed to protect us, the public,

10   and turned them as agents of terror.

11           "It was on June 30th, 2013, late Friday night, that my

12   sister received a distressing call from our brother Gerry.  He

13   said there were men in cars parked outside and they were

14   watching the house.  He wasn't sure who they were.  My sister

15   said, Gerry sounded terrified.  He told her, If you don't see

16   me again, I just want you to know I love you and the family.

17           "Imagine, Louis, what if that was someone you loved?

18   What if that was someone that you brought here today?  Perhaps

19   just for a moment you can envision this horror and feeling of

20   helplessness.  Ironically, Gerry was advised to call the police

21   and make a report, which he did.  But you know well what

22   happened to that police report.

23           "The following evening, Saturday, June 21, 2013, you

24   had Gerry arrested as he was parking his car to attend mass

25   with his girlfriend.  How absolutely revolting to have your

 1   wife's uncle, an innocent person, who called you his friend,

 2   not just arrested but taken into custody at the church he

 3   attended every week.  I cannot imagine how shocking and

 4   humiliating it must have been for him.  My brother, your

 5   friend.

 6            "You, Louis, are an extreme disgrace to your

 7   profession.  And you took great pains in the aftermath of your

 8   2019 conviction to let your family and the department and the

 9   community know how the -- and the -- through the media how

10   sorry you were for their embarrassment.  But until today, you

11   have never apologized or expressed the slightest regret for the

12   pain you inflicted on our mother or our brother or our family

13   for the years of terror, torment and misery you caused us all."

14            May justice prevail today.  Thank you, Your Honor.

15            THE COURT:  All right.  Thank you.

16            MR. ORABONA:  Thank you, Your Honor.

17            You know, the public's faith in the criminal justice

18   system really depends on everybody playing by the rules.

19   That's what the public counts on, everybody playing by the

20   rules.  The public and the police department, and as you

21   listened to the victims here today, you know, especially from

22   Ms. Malott, who just spoke, she not only represents, you know,

23   a family that was victimized, but she represents the public,

24   the community that was victimized.

25            And there's a third party that we haven't spoken too

1    much about, and that's the honest men and women of the Honolulu

2    Police Department, because they've been victimized by all of

3    this as well, because when that public trust is shattered from

4    the actions of what the Chief of Police did in this particular

5    case, the highest levels of corruption.

6          And Mr. Kealoha's attorney argued that he wasn't the

7    mastermind, but he's such an important part of that scheme that

8    you saw unfold in the courtroom during the trial because

9    without him and his CIU unit, it can't come to fruition,

10    because Katherine only controls one part of that arm that can

11    really come down on the victims in this case.  You need two

12    arms to squeeze tightly, and that is exactly what happened.

13          Mr. Kealoha and the Honolulu police officers that he

14    had engaged in this criminal act were the second arm that

15    squeezed together.  They are the ones that really put the

16    pressure down.  They were the ones that had the power to

17    disrupt normal government function.  When officers are supposed

18    to be out on the street protecting the community, instead 10 to

19    15 officers are driving around following an innocent man for a

20    crime he did not commit.

21          And for those actions, Your Honor, those are the most

22    serious at the highest level of corruption, and I don't think

23    that Mr. Kealoha, when we talk about deterrence, which I think

24    is a really important factor, specific deterrence for

25    Mr. Kealoha, he won't be in that position again.  But I think

1  general deterrence is something that is really, really

2  important because it must be that when you're trying to

3  generally deter other officers from even breaking the smallest

4  law or taking advantage of the power that they wield, because

5  officers do have enormous power and they have great

6  responsibility with that, and general deterrence is a very

7  important factor in this particular case.

8       Your Honor, for all the crimes that Mr. Kealoha

9  committed, we are asking that you sentence him to 87 months.

10  Thank you.

11       THE COURT:  All right.  Well, what I must do, of

12  course, is consider the relevant guidelines here.  One of

13  those, of course, are the -- are the guidelines I must

14  consider.  And here we have a total offense level 24, criminal

15  history category 1, with an advisory range of 51 to 63 months.

16       I'm not going to recite each of the 3553(a) factors.

17  I do want the record to reflect I'm very cognizant of the

18  parsimony clause that requires me to impose a sentence that is

19  sufficient but not greater than necessary to comply with the

20  goals of sentencing which are set forth in 18 U.S.C.

21  Section 3553(a)(2), and in shorthand, those are retribution,

22  incapacitation and deterrence.

23       Now, I'm going to go through somewhat of a timeline.

24  It will be a briefer one than I did this morning, but I do

25  believe it is important to provide some context before I get

1     into the sentence that I believe is appropriate here.

2          Some of this evidence I'm going to talk about really

3     does relate to Katherine Kealoha, and I'm not suggesting all of

4     it are things that Mr. Kealoha necessarily engaged in or even

5     knew about, but provides context for what he did do and what he

6     did know about.  And there's no question that he engaged in

7     extremely serious conduct here.

8          Now, we know about the reverse mortgage.  We know that

9     Katherine misrepresented the true nature of that mortgage to

10    Florence, who was then 89 years old.  That there was to be a

11    benefit for Gerard in getting the Greenwood condo, but there

12    would be a benefit to the Kealohas in getting their sort of

13    finances in order, increasing their credit or fixing their

14    credit, and then paying off the reverse mortgage in short

15    order, three to six months.

16         Well, we know that was all a lie.  That the net

17    proceeds were deposited into an account that Katherine

18    controlled in part.  The condo certainly was purchased.  But

19    the remainder wasn't used to consolidate debt and help them get

20    their credit in order.  It was stolen, plain and simple, with

21    $135,000 of those funds being used in a six-month period.

22         Now, Mr. Kealoha, maybe you didn't know check by check

23    what Mrs. Kealoha was doing.  I can accept that.

24         I remember the trial testimony very well, Mr. Barbee,

25    about -- that you put forward about the number of checks that

1   he wrote over the years.  And it was pretty compelling evidence

2   to show that he wasn't a hands-on person with the finances.

3   But you don't infuse $135,000 in a six-month period into a

4   marriage without knowing it.

5          And if there's one thing I can say about you,

6   Mr. Kealoha, you're a smart guy.  That's very clear to me.

7   You're a very smart person.  You're not blind to what's going

8   on around you.  At some level you may have stuck your head in

9   the sand.  I understand that.  But you don't infuse that sort

10  of money without knowing it.  And 26,000 of that was spent for

11  you, ironically, for your induction brunch when you became

12  Chief of Police.  More was spent on Mercedes and Maserati and

13  so on and so on.

14         So, some of this is what I believe to be the case

15  based on fair and reasonable inferences I'm drawing from the

16  evidence, and that is, that Mr. Kealoha knew that his and

17  Katherine's salaries were insufficient to support the lifestyle

18  that they selected.  I want to be clear about that.  They

19  selected, they chose to live.

20         Now, we do know then that bad blood began to develop

21  between Florence and Gerard in particular and Katherine.  And

22  as we just heard, you know, Louis -- they tried to pull Louis

23  into it, but, you know, there was nothing that I recall that

24  came out of trial as far as -- as what he did.  That is, as far

25  as I know, nothing.  But the Puanas tried to get an explanation

1    as to what was going on with the reverse mortgage and were

2    treated with silence.  No explanation came.

3           Katherine took steps to sort of hide the truth.  And

4    in September of 2012, wrote this letter -- Florence, I'm sorry,

5    wrote a letter to Katherine expressing frustration and

6    threatened legal action, and we know Katherine's response.  I

7    went through that this morning.  Very, very aggressive is the

8    only fair way to categorize that letter.

9           And then we know that Gerard is arrested in June of

10   2011 for entering a neighbor's house.  That Katherine engaged

11   in some bizarre and troubling behavior, and met with a sheriff

12   privately, had Gerard sent to Sand Island Treatment Center,

13   even though from the evidence at trial it did not appear he

14   normally would qualify or needed it.  And Katherine took some

15   actions in relation to his plea of guilty that we talked about

16   earlier.

17          Now, again, I don't know that you know -- knew all of

18   that, Mr. Kealoha.  I don't know that you knew all of that.

19   But it's hard to believe you didn't know trouble was brewing.

20   Serious, serious trouble was brewing between Gerard and

21   Florence on the one hand, and Katherine and, by implication,

22   you on the other.  That a lawsuit was threatened.  That money

23   was taken and converted to personal use that shouldn't have

24   been.  And it wasn't going to look good for you.  You were,

25   after all, the Chief.

1          So the Kealoha mailbox is stolen late in the evening

2     of June 21st.  Apparently early the next morning, you were

3     going surfing, you noticed it.  You tell Kathy, but you go on

4     to surf.  Bobby Nguyen comes to the house and removes the

5     surveillance video.  And at 1:28, Katherine speaks to Bobby

6     Nguyen, and then a couple minutes later calls 911 to report the

7     mailbox stolen.

8          Now, we know from the evidence that Ms. Kealoha met

9     with the police.  She lied to them about the theft and the

10     value of the mailbox and so forth.  And a decision was made.  A

11     decision that I believe you were part of.  Based on the

12     evidence and based on your trial testimony, what I believe was

13     right next door here -- Judge Kobayashi was in her normal

14     courtroom -- where you lied.

15          Think about that.  The Chief of Police, one of the

16     largest police departments in the country, gets on a witness

17     stand in federal court, raises his right hand, swears to tell

18     the truth, the whole truth and nothing but the truth, and then

19     lies and says, That man Gerard Puana right there, he's the one

20     on the video.  Knowing full well it was a lie that he was not

21     the man on the video.

22          But you and your wife and those under you went to work

23     to frame Gerard Puana.  And Mr. Orabona is absolutely right,

24     you were not the mastermind, but you did master the frame job

25     that followed.  Because it could not have succeeded without HPD

1    behind it.  And that's what makes this case so shocking at the

2    end of the day.  That's what makes it so shocking.  It has

3    disturbed so many people.  Because it could not have succeeded

4    but for you and but for your position.

5            And this is worth repeating.  The Chief of Police, of

6    a major American city, worked overtime to frame someone of a

7    crime they didn't commit, and then took the witness stand

8    saying that that is the person in the video stealing the

9    mailbox.

10           And I will say what I said this morning.  With

11   absolute certainty, I will say that is not Gerard Puana in that

12   video.  Neither you nor Katherine has come forward and said who

13   it is, and you don't have to.  But I know it's not Gerard

14   Puana.  And when you were a hundred yards or so away over in

15   this courtroom, you knew that as well.  But it didn't matter.

16   The oath didn't matter.  And what you did to Gerard didn't seem

17   to matter.

18           And the unfortunate part of this is, given your

19   position as chief, this task wasn't that difficult.  And it's

20   why it went undetected for so long.  Who would have thought?

21   Who would have imagined?

22           Now, I don't know, and I've thought long and hard

23   about this, I don't know why you made the statements you made

24   after, after you falsely identified Gerard as the person in

25   that video when you testified before Judge Kobayashi.  I do

1   believe you intentionally created a mistrial based on what you
2   said.
3           The government's theory, as I recall from some of the
4   briefing early on, is that, you know, this wasn't playing out
5   so well.  Mr. Silvert was being pretty aggressive and things
6   were unravelling a bit.  And this was a way to pull the plug.
7   That's the explanation, number one.
8           Explanation number two is maybe you started to feel
9   this wasn't right.  You couldn't do it anymore.  I don't know.
10  I don't have an answer to that.  What I do know is you lied.
11  And then you caused a mistrial.  That's the evidence before me.
12          And as part of the CIU involvement in the
13  investigation into the mailbox theft, CIU members conducted
14  24-hour surveillance on Gerard from the day after June 21st
15  through June 29th, using many, many officers.  And it doesn't
16  take much to reach the conclusion that you authorized this.  Or
17  approved it.  I'm not saying you signed off on it necessarily.
18  It was part of the effort to frame Gerard.  It's just hard to
19  imagine that those in CIU would not have done this without your
20  okay or belief that's what you wanted.
21          So this timeline and your involvement in this matter
22  tells all of us I think what is obvious, that both you and
23  Katherine took extreme measures to silence Gerard and Florence.
24  To minimize them to make sure they could not do harm to you or
25  harm to your reputation.

1          The fact that you set him up in isolation makes no
2     sense.  Why -- why would you do that?  But when you understand
3     the financial theft that Katherine engaged in and that you
4     find -- I'm sorry -- and that you profited from directly, it's
5     understandable.  Twisted.  Criminal.  Almost unbelievable that
6     the Chief of Police would do it, but at least it makes sense.
7     It fits.

8          I agree that Katherine was the mastermind behind this.
9     But you were right there by her side.  Right by her side.
10    Cheering her on and using your position as chief to aid the
11    criminal enterprise that you had helped establish.

12         Now, I won't go into the bank fraud conduct in great
13    detail.  I do believe that you were, as I think I've already
14    said, lesser -- much lesser involved in that.  But as you
15    admitted in the plea agreement, you understood that there were
16    fraudulent statements being made to the finance -- financial
17    institutions to obtain money.  It was part of the overall need
18    to protect your image, to get in that money, protect the image
19    and live a lifestyle that two of you could not afford on your
20    public servant salaries.

21         Now, there are factors in mitigation, as Mr. Barbee
22    has pointed out.  I won't go through all of these, but we have
23    no prior criminal history, no history of substance abuse.  You
24    have family support.  I do recognize your age.  And as I said,
25    that Katherine is more culpable.  I mean that -- that's pretty

1   obvious.  But the fact that she was more culpable, as I think I
2   made clear, cannot excuse in any way your actions and what you
3   did as Chief of Police.  She was not chief, you were.

4         At any point in time, Mr. Kealoha, you had the power
5   to say, Stop it.  No.  You've taken this too far.  We need to
6   end this.  Gerard, setting up Gerard?  No.  Can't do that.  But
7   you didn't do that.

8         As far as the COVID risk, Mr. Barbee, I have to say
9   I'm not intending to send -- I mean, I don't know what they're
10  going to ask for, the government, but I can tell you because of
11  COVID, for sure I'm not going to incarcerate him now, and we'll
12  see how long until mittimus issues.  So I don't know that
13  that's an issue I can take into account right now because I'm
14  not seeing mittimus today.

15        So when you look at all of these factors, clearly
16  there are many more in aggravation than in mitigation here.
17  The breadth of this criminal conduct is astonishing.  It spans
18  many years and takes on several forms of corruption and
19  coverups.  It reached, as you know, the highest levels of our
20  city government that included you as Chief of Police.  And it's
21  clear you were driven not by public service, not by what took
22  you to the police department and the academy in 1983 at the age
23  of 22, and I don't doubt that you had good motives then.  I
24  don't doubt that if you could go back then and see your future,
25  you would say, There's no way I would ever do anything like

1    that.  But it's where you ended up.  It's where you ended up.

2         And the evidence demonstrated the extent to which you

3    would go to protect your reputation and that of your wife and

4    to protect your financial status in the community.  To have an

5    innocent relative charged with a crime he did not commit and

6    one which could result in significant prison time.  And to do

7    so, you had to summon the help of multiple HPD officers,

8    diverting law enforcement attention from legitimate police

9    work, to serve your personal avarice.  You unabashedly used the

10   power given to you to do good, and you set up Gerard.

11        And at least within HPD CIU unit, nobody apparently

12   was willing to question you.  Or to challenge you.  I have no

13   idea, of course, if anyone came to you and said, Louis, we

14   should be doing this?  Does this make sense?  But from the

15   evidence we have before us, everyone marched along in lockstep

16   with the goal of setting up Gerard Puana.

17        As I said earlier today, truth can be stranger than

18   fiction.  This truly is the case where the truth seems to be

19   stranger than fiction.  And this prosecution and the conduct

20   you engaged in has had measurable impact on our community.

21   Your conduct, that of Katherine, Bobby Nguyen and Derek Hahn,

22   has shaken the confidence in our governing institutions, and

23   most notably HPD.  And of the four defendants who were

24   convicted, you stand atop of that pile.  Again, because you

25   were chief, they weren't.

1          It's left many in the community speechless.  How could

2     this happen here?  How could it go on for so long undetected?

3     But the answer ultimately isn't a mystery when you sit back and

4     think.  Again, you used your power, you abused your power at

5     HPD to nurture, feed and hide the corruption.

6          So here we have a guideline range of 51 to 63 months.

7     Ultimately I do believe an upward variance is appropriate in

8     this case.  We've had a lot of discussions and hearings on

9     which guideline section applies, 2H1.1 or 2J1.2.  It was hotly

10    contested.  Ultimately I found 2J1.2 applies.

11         2H1.1 would have in my view more closely tracked the

12    actual offense conduct here.  But that wasn't what I was

13    looking at.  I was looking at the jury's verdict.  And 2J1.2,

14    given the jury's verdict, is what I found is the appropriate

15    guideline.

16         So stated differently, the guideline that I apply here

17    today centers on obstruction of justice, not deprivation of

18    civil rights.  And there's no question in my mind, none

19    whatsoever, whether you apply a preponderance standard, a clear

20    and convincing standard, a beyond a reasonable doubt standard

21    or beyond any doubt standard, there's no question that the

22    defendants conspired to deprive Gerard Puana of his civil

23    rights.  To frame him of a crime he didn't commit.  And they

24    succeeded.  They did frame him for a crime he didn't commit.

25    He was arrested and put on trial.

1        And the sentence needs to reflect your position in the

2   community.  Maybe the ultimate position of trust in the

3   community, the Chief of Police.  So under Section 3553(a), I do

4   believe and will take this conduct into account, the

5   deprivation of civil rights.

6        So as I said, we have a total offense level 24,

7   criminal history category 1, a 51 to 63 months.  I'm going to

8   vary upward, as I said, to take into account defendant's

9   position as Chief of Police, and to reflect the civil rights

10  violation, not taking into account in full by the guidelines.

11  So I'm going to vary upward from that range of 51 to 63 months.

12       My intended sentence is as follows:  A sentence of

13  84 months of incarceration as to Counts 2, 6 and 8, under

14  17-582 and Count 4 under 18-68, and 60 months as to Count 1

15  under 17-582, with all counts to run concurrently.

16       As far as supervised release, three years as to each

17  count to run concurrently.  Restitution, I'm not going to

18  impose a fine because of the amount of restitution involved

19  here.  Restitution, get back to that, of $237,698.56.  And a

20  $500 special assessment.

21       Now, as far as the restitution, in the proposed order

22  you sent me there's some reference to a partial pavement of the

23  restitution.  What -- and I forgot to ask you about that

24  earlier.  What was that in reference to, Mr. Orabona?  You

25  talked about an offset.

1          Is that the money from -- that's in the Court's

2     registry?

3          MR. ORABONA:  No, my -- Your Honor, that's money

4     received from a third party.

5          THE COURT:  I don't know what that is.

6          MR. ORABONA:  Mr. Kevin Sumida paid a certain amount

7     of money into -- to the government as part of -- as part of a

8     separate action, Your Honor, and so that $27,000 would be part

9     of that.

10         MR. WHEAT:  The legal fees that Mr. Sumida took from

11    Florence Puana's bank account, about $108,000, is an offset.

12    When they lost the guardianship case for Florence, Katherine

13    and Sumida were ordered to pay the legal fees for that, and

14    they had already taken the money out of her account.  So

15    Mr. Sumida returned that money to the Puanas.

16         THE COURT:  Okay.  And that was part of the

17    calculation of the overall restitution amount?

18         MR. WHEAT:  Correct.

19         THE COURT:  And that money has been repaid.

20         MR. WHEAT:  Yes.

21         THE COURT:  Okay.  All right.  So I think in Katherine

22    Kealoha's and this, we should give the full amounts and say

23    less credit for any amounts paid, and then I can enter these

24    orders separately, which I think probably makes sense in this

25    case.

1           MR. WHEAT:  Correct.

2           MR. ORABONA:  Yes, Your Honor.

3           THE COURT:  All right.  Mr. Barbee, I assume you have

4    no problem with any of that.

5           MR. BARBEE:  No, Your Honor.

6           THE COURT:  As it lessens the restitution amount.

7           MR. BARBEE:  No, Your Honor.

8           THE COURT:  Okay.  All right.  So, Mr. Barbee, would

9    you waive my reading of the mandatory and standard conditions

10   of supervision?

11          MR. BARBEE:  Yes, Your Honor.  So waived.

12          THE COURT:  So in addition to the mandatory and

13   special conditions of supervision, Mr. Kealoha, you must

14   cooperate in the collection of DNA.  You must report to the

15   probation office in the federal judicial district where you are

16   authorized to reside within 72 hours of the time of your

17   release, unless the probation officer instructs you to report

18   to a different office or within a different time frame.

19          It would be my intent to waive the drug testing

20   condition.  Is there any objection to that?

21          MR. ORABONA:  No, Your Honor.

22          THE COURT:  All right, I'll waive the drug testing

23   condition, given there's no history or indication of substance

24   abuse.

25          You must participate in a mental health assessment and

1   any recommended treatment in a mental health program and follow

2   the rules and regulations of that program.  The probation

3   officer in consultation with the treatment provider will

4   supervise your participation, such as provider, location,

5   modality, duration and intensity.

6           Restitution is due jointly and severally with

7   Katherine P. Kealoha as follows:

8           In 17-582, $11,565.25 to Gerard Puana.

9           $60,863.49 to the estate of Florence Puana, to be

10  offset as stated by the government.

11          And then 18-68, Ransen Taito, $81,384.91.

12          Ariana Taito, $83,884.91.

13          So total restitution, $237,698.56.  Like I say, less

14  these credits the government referenced.

15          Restitute -- now, as far as the amount of restitution

16  while in custody, let's talk about that, Counsel.  Right now as

17  I understand it, it's about nine -- 9700 a month?  Is the

18  pension amount?

19          Let me see if I have -- yeah, 9720 approximately.  Is

20  the net, net HPD pension amount.

21          So I look at the amount of restitution that he could

22  pay while in custody as different than the amount he could pay

23  once he's no longer in custody.

24          Mr. Orabona, Mr. Barbee, did you want to speak to

25  that?

1          MR. ORABONA:  We'll defer to the Court on that, Your

2     Honor, given the -- given the pension payment.

3          MR. BARBEE:  Likewise, Judge.  I haven't studied the

4     details on that, so we'll -- we'll defer to the Court.

5          THE COURT:  All right.  So restitution payments of

6     7,500 per month shall commence 30 days after the start of any

7     term of incarceration.  Thereafter -- and really thereafter

8     means when he's out of custody, so no longer serving time.  So

9     that shall run during the term of imprisonment.  Thereafter any

10    unpaid balance is to be paid during the period of supervision

11    in monthly payments of 50 percent of your monthly income, gross

12    monthly income, commencing 30 days after the start of

13    supervision.

14         The Court may order this requirement to be changed

15    from time to time as your circumstances warrant.  But no court

16    order shall be required for your voluntary agreement to pay

17    more than the court-ordered amount.  Interest is waived.  And

18    payment must be made by payroll deduction when applicable.  You

19    must notify Probation of any change in your financial

20    circumstances that affect your ability to pay, and that may be

21    reviewed annually by Probation.

22         When you get out of custody, I'm going to ask

23    Probation to look at that right away because I don't know where

24    you're going to be in relation to the divorce and then where --

25    where all that money goes.  And so that may be appropriately

1    change depending on that, Mr. Kealoha.  Okay?

2              But while you're in custody, it will be $7500 per

3    month will be paid towards your restitution obligation.  After

4    that, as of now I'm going to say 50 percent of your gross, but

5    I'll have Probation look at that and we'll see where that is

6    exactly at the time.

7              You must provide Probation access to any requested

8    financial information and authorize the release of any

9    financial information, and that may be shared with the U.S.

10   Attorney's Office.

11             You must not incur new credit charges or open

12   additional lines of credit or apply for any loans without the

13   prior approval of Probation.  You must not borrow money or take

14   personal loans from any individual without the prior approval

15   of Probation.

16             You must maintain a single personal bank account,

17   separate and apart from your spouse, any family members or

18   others, into which all income, financial proceeds and gains

19   must be deposited, and from which all expenses must be paid.

20             You must apply all monies received from income tax

21   refunds, lottery winnings, inheritance, judgments, and any

22   anticipated or unexpected financial gains to the outstanding

23   court-ordered financial obligation at the discretion and

24   direction of the Court.

25             You must notify the probation officer if you obtain an

1   interest in any property under any other name or entity,

2   including a trust, partnership or corporation.  You must notify

3   the probation office before transferring any property you own,

4   directly or indirectly, including any interest held under any

5   other name or entity, including a trust, partnership or

6   corporation.

7           You must not communicate or otherwise interact with

8   Gerard Puana, Ransen Taito, Ariana Taito, or CPM -- you know

9   who that is, sir?

10                  (Counsel and client conferring.)

11          THE DEFENDANT:  (Nods head up and down.)

12          THE COURT:  Okay?  All right.

13          -- either directly or through someone else without

14  first obtaining permission of the probation officer.

15          And last, you must submit your person, place -- I'm

16  sorry, person, property, house, residence, vehicle, papers or

17  office to a search conducted by Probation.  Failure to submit

18  to a search may be grounds for revocation.  And you must warn

19  any occupant of your premises regarding this condition.

20          A probation officer may conduct a search only when

21  reasonable suspicion exists that you have violated a condition

22  of supervision and the area or areas to be searched contain

23  evidence of this violation.  Any search must be conducted at a

24  reasonable time and in a reasonable place.

25          Now, I want to say that I've considered this

1   carefully, this sentence.  And I considered the parsimony

2   clause.  And I do believe that general deterrence is a critical

3   component of this sentence.  As Mr. Orabona states, I agree

4   with specific deterrence, Mr. Kealoha is not going to be in a

5   position to abuse the position of trust again.

6          But I think you look at the goals of sentencing,

7   including retribution and general deterrence, this sentence,

8   although significant, does comport with the parsimony clause.

9   That is, I comply -- I'm sorry, I impose a sentence that is

10  sufficient but not greater than necessary to comply with those

11  goals of sentencing.

12         Are there any legal objections to the intended

13  sentence as stated?

14         MR. ORABONA:  No, Your Honor.

15         MR. BARBEE:  No objection.

16         THE COURT:  All right.  So the Court does impose

17  sentence as stated.

18         Mr. Barbee, you may have been here earlier, but I

19  believe the government indicated that they are going to seek

20  what I've learned since this morning is something called

21  restoration from the Department of Justice, such that the funds

22  now being held in the registry of the Clerk of Court could be

23  applied to restitution as opposed to forfeiture.  That

24  requires, as I understand it, a specific finding from a

25  specific person at DOJ for that to happen.

1              And so that will be applied for is my understanding;

2    is that right?

3              MR. ORABONA:  That's our intention, Your Honor, yes.

4              THE COURT:  All right.  So that may further reduce the

5    restitution amount if that -- if that is approved.

6              MR. BARBEE:  Yes, Your Honor.

7              THE COURT:  Okay.  Mr. Kealoha, you understand -- you

8    also understand, so there are certain things that you agreed to

9    forfeit through the plea agreement.  Do you remember that?

10             THE DEFENDANT:  Yes.

11             THE COURT:  And I'm going to be ordering a final order

12   of forfeiture regarding those items.  Do you understand that?

13             THE DEFENDANT:  Yes, sir.

14             THE COURT:  Do you have any questions about that?

15             THE DEFENDANT:  No, sir.

16             THE COURT:  All right.  Is there anything else in that

17   regard or anything else I need to cover, Mr. Orabona?

18             MR. ORABONA:  No, Your Honor.  Thank you.

19             THE COURT:  All right.  So the Court does impose

20   sentence as stated.

21             Is there anything to dismiss then, Mr. Orabona?

22             MR. ORABONA:  Yes, Your Honor.  We would move to

23   dismiss any remaining counts against this defendant without

24   prejudice.

25             THE COURT:  All right.  So I'll dismiss the remaining

1    counts in the bank fraud third superseding indictment as to --

2    as to Mr. Kealoha.

3              All right.  So as far as recommendations, Mr. Barbee.

4              MR. BARBEE:  Yes, Your Honor.  In speaking with

5    Mr. Kealoha and some of the concerns that I've already raised

6    with the Court, his first preference would be on the West Coast

7    of the United States, specifically FCI Sheridan, Oregon, or FPC

8    Sheridan or any other --

9              THE COURT:  Well, why West Coast, though?  I mean, you

10   know, you say that he may face a greater hardship than others.

11   He's more likely to be known by Hawaii inmates on the West

12   Coast than -- which are more likely to be in the West Coast

13   than if he went to the East Coast.

14             MR. BARBEE:  It's kind of a mix of factors.  It would

15   be on the plus side of the West Coast would be the visitation.

16   When COVID clears, there's going to hopefully be the formally

17   liberal visitation.  And that's the primary reason.

18             But, yeah, on the other side, the Court's correct, he

19   might be better known at Sheridan.  But we've discussed this,

20   and he has also discussed it with other people that know way

21   more than I do about the BOP procedures, and he is comfortable

22   requesting Sheridan.

23             THE COURT:  All right.  So I'll make FCI Sheridan to

24   be near family as his number one request.

25             Okay.  And self-surrender date.  You can argue,

1   Mr. Orabona, but you heard me already, I think.

2          MR. ORABONA:  I did, Your Honor.  You know the

3   government's position on this, but, you know, we understand the

4   COVID situation, but we would like a surrender date because, as

5   Your Honor, you know, just ordered, he'll start paying

6   restitution once he starts serving his sentence.  So for the

7   victims, that would be our position would be remand, but we

8   understand the Court's ruling on that already.  Thank you.

9          THE COURT:  All right.  Yeah, I mean just the COVID

10  epidemic, Bureau of Prisons I think is putting up a good fight,

11  but it is a fight, and they don't always win that fight.  And

12  so unless I believe someone is a danger, and I don't see that

13  right now -- a danger to the community right now, and I don't

14  see that for Mr. Kealoha, my general view is people can wait

15  until -- until we have some protection within the prisons.

16         MR. BARBEE:  Can we set a status date down the road?

17         THE COURT:  No, I think we can set a mittimus date,

18  and then we'll see where that is.

19         MR. BARBEE:  Okay.

20         THE COURT:  Okay?  So I suggest we set a date in

21  April, and then we'll see where things stand.

22         MR. BARBEE:  Makes sense.

23         THE COURT:  All right.  Can we get a date in April?

24         THE COURTROOM MANAGER:  April 12th, 2021, by 2 p.m.,

25  Your Honor.

54

```
 1            THE COURT:  All right.  So, Mr. Kealoha, I'm going to
 2   let you stay out under the present conditions of bail.  Do you
 3   understand that, sir?
 4            THE DEFENDANT:  Yes, sir.
 5            THE COURT:  Okay.  But you must agree to self-
 6   surrender to the institution to which you're designated.
 7   Bureau of Prisons will make that decision, not me.  I'll make a
 8   recommendation, but they'll decide.  By 2 p.m., April 12th,
 9   2021, at the institution to which you are designated.  Do you
10   understand that?
11            THE DEFENDANT:  Yes, sir.
12            THE COURT:  Do you promise me you'll do that?
13            THE DEFENDANT:  Promise.
14            THE COURT:  Do you understand failure to turn yourself
15   in by that time on that date is a separate criminal offense for
16   which you can be prosecuted?
17            THE DEFENDANT:  I will be compliant, sir.
18            THE COURT:  All right.  Okay.
19            All right.  So other than appellate rights, is there
20   anything else we need to cover, Mr. Barbee?
21            MR. BARBEE:  No, Your Honor.
22            MR. ORABONA:  No, Your Honor.
23            THE COURT:  Ms. Ing-Dodson, does that cover
24   everything?
25            PROBATION OFFICER:  I believe so, Your Honor.  Nothing
```

1    else.

2              THE COURT:  Okay.  So, Mr. Kealoha, you did enter into

3    a plea agreement that covered both cases, including the trial

4    case and the bank fraud, in which you waived most of your

5    rights to appeal the sentence I just imposed.

6              But if you believe you can appeal a matter not waived

7    in the plea agreement or if you believe that waiver provision

8    is not enforceable, you must file a Notice of Appeal within

9    14 days of entry of judgment.  Failure to do so acts as a

10   waiver, meaning you forever give up your right to appeal.  If

11   you wish to bring an appeal but cannot afford counsel, one

12   would be appointed for you free of charge.  Do you understand

13   those rights?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  All right.  And Mr. Barbee will cover

16   those with you in some more detail at some point after the

17   sentencing here today.

18             All right.  Anything else, Counsel?

19             MR. ORABONA:  No, Your Honor.

20             MR. BARBEE:  No, Your Honor.

21             THE COURT:  All right.  Court is in recess.

22             (The proceedings concluded at 2:58 p.m.,

23   November 30, 2020.)

24

25

1                    COURT REPORTER'S CERTIFICATE

2

3          I, CYNTHIA FAZIO, Official Court Reporter, United

4     States District Court, District of Hawaii, do hereby certify

5     that pursuant to 28 U.S.C. §753 the foregoing pages is a

6     complete, true, and correct transcript of the stenographically

7     reported proceedings held in the above-entitled matter and that

8     the transcript page format is in conformance with the

9     regulations of the Judicial Conference of the United States.

10         DATED at Honolulu, Hawaii, January 6, 2021.

11

12

13                         _/s/ Cynthia Fazio_____
                           CYNTHIA FAZIO, RMR, CRR, CRC
14

15

16

17

18

19

20

21

22

23

24

25